The next case today is IDC Properties, Inc. v. Chicago Title Insurance Company, Appeal Number 21-1757. Attorney Venditulli, please introduce yourself for the record and proceed with your argument. Good morning. My name is Kevin Venditulli. I'm here on behalf of the appellant, IDC Properties, Inc., for whom I've served as general counsel since 2007. I'd like to begin by briefly highlighting how we came to this appeal before diving into the heart of the matter. In 2013, the district court issued a lengthy and well-reasoned opinion, essentially denying a similar motion for summary judgment as to what he later granted. In that, he correctly concluded that the cause of the losses was defects in the condominium documents that preexisted the issuance of the policy. He highlighted the fact that everything was a matter of public record and nothing was standing in the way of Chicago Title looking at the documents and reaching the exact same conclusion that was reached by the Rhode Island Supreme Court 10 years later in the America decisions. As a result of the 2013 decision and the finding that there were a number of factual issues that were required at trial, the case proceeded forward into all the pretrial motions that are indicated in the record. Nothing really changed in that time period. The pandemic struck on the back end of it, but there was no new evidence. Eight years later or so, the district court essentially reversed itself, finding that the defects in the condominium documents were not the cause of the losses, but in fact, there were no losses and denied properties the opportunity for trial. As I hope to explain, the district court got it right the first time it had this in front of it, and this court should remand the trial and give properties the opportunity to at least present evidence as to this matter. The issue that I really wanted to dive into in this argument, however, was the cause of the loss and the defects in the condominium documents, because that isn't a factual issue. That doesn't require a trial, in my opinion. That is inherent in the documents. It was baked into those documents and existed since 1988. The defect that caused all properties' losses was the fact that those condominium documents provided for the existence and creation of airspace master units, just columns of airspace over vacant land in which the owner had the discretion. This will help me, because I found this difficulty in trying to get my arms around the arguments in the case. There's a lot of discussion in the briefs about what the condominium documents say and what the statute says and what the Rhode Island Supreme Court says, but isn't the threshold question, what was the agreement about the insurance? With respect to that question, which seems to me the antecedent question, what was insured? What are you relying on to say that what was insured was something that couldn't be insured? That question caught a little bit. I want to make sure I get an accurate answer to you. Do you mind repeating it? What are you relying on to say there is a triable issue of fact on the antecedent question, not the question of what did the condominium documents allow, what does the statute allow, what does the Rhode Island Supreme Court decision allow, but on the antecedent question of what did Chicago title insurance insure? Because your contention is they insured something that couldn't be insured. What is the evidence that shows that? My contention is that they insured something that could not exist. Essentially, it was DOA. It was still born in 1988. What is the evidence that that is what the Chicago title insurance was giving you insurance in? That's illustrated in Schedule A of the policy where they expressly state that they're insuring the development rights. But how does that demonstrate that they were insuring a development right of the type that could not be exercised? The development rights are scheduled out in the condominium documents. 6.3B of the FAR Declaration, as I refer to it, the First Amendment Restated, specifically defines that development right, which is really the heart of our claim. We're not claiming all of the development rights were impacted or impaired. We're saying that the right to create that airspace master unit that's laid out in 6.3B. That's in the sixth amended FAR? No, the declaration itself. It's the First Amendment Restated Declaration. It's in the appendix. I can provide you with the site. And the contention is that if I put the text together of the insurance contract, that will trace me to the text of a document that existed at the time, namely the declaration, and the declaration gave you a right to do something that it now turns out after the Rhode Island Supreme Court decision you can't do. 100% accurate. What? 100%, yes. Yeah. And what, so just help me, walk me through that, because that seems to me if you can't demonstrate that point, I don't see how you can win. On the other hand, if you can, it seems like you've got a strong case. So what is the text in the insurance agreement that you're hanging your hat on? And what does that trace me to? What document that was pre-existing at the time of the insurance agreement that will show me, oh, you had plainly were being given insurance in a right to do something that it now turns out you can't do? So in the policy, in Schedule A of the policy, Chicago title states what it is that it's insuring. And it states all right, title, and interest in the south unit, which I'm putting in quotations because they had different names, but the south unit, the west unit, and in that particular case, the development and special declarence rights in the condominium, as created by the condominium documents. When you look at the condominium. But how do we know at that time that, and maybe this is an even stronger point with respect to the north unit, which you're also challenging. Let's start with the north unit before you do it with the south and the west because I understand the complexity that arises there. Just walk me through how your argument works with respect to the north unit. So we aren't claiming the north unit was even insured. We're claiming that the development right to create a master unit over was insured. That development right is spelled out in Section 6.3b of the FAR Declaration. And 6.3b of the FAR Declaration, and that existed at the time the insurance was given? Correct. That existed since the outset. And the language in Schedule A of the insurance agreement is going to be every right, title, and interest. It's that same language. Yes. So Schedule A identifies all right, title, and interest in the development rights and special declarence rights, and those are scheduled out in Article 6, of which 6.3b is one. Okay, and now with respect to what 6.3b says, does it read in a way that plainly reveals you would be able to do something that it turns out the state statute prohibits you from doing? Yes, it's not limited. It does itself. But you also have to understand what the nature of these airspace master units were, because it refers to the creation of a master unit over the reserved area. The master units themselves were columns of airspace over land, but they were designated for separate ownership as opposed to the common elements, which were not. So the key there is they were meant to be the units of the condominium, and they were meant for separate ownership, but as the Rhode Island Supreme Court found, it turns out they were not. So like the swimming pool, they were owned by the owners of the other units. Counsel, as I approached the case, I had the same basic question that Judge Barrett did. As I read your brief, you seemed to rely in part on an endorsement, which you said guaranteed that all of the title documents were in conformance with the Rhode Island condominium statute. Your opponent, by the way, has a very different view of what was ensured, but I thought in some ways your argument depended on that endorsement. So could you talk a little more about that, please? Yes, I'd be happy to. The endorsement is an attachment to the policy that is typically used in the condominium context to essentially extend coverage to that context. In this case, what you'll find in the record is a template, because when the condominium policy, our policy at issue here, although it references on the last page that that's incorporated, it was never attached. So we've attached a template with the language on it. The endorsement really, because condominiums are statutory creatures, it ensures that the rights in the condominium, if they're contrary to the statute, because I can make them go away, that they're essentially, they are covered. But I guess I'm still not grasping, because I thought the idea was, at least your opponent's saying, is, well, there was a time period in which you could have exercised a development right, subject to some limitations, correct? Correct. How do we know from, what I'm not understanding, how do we know from the face of the documents that you just identified, both the insurance agreement and the FAR 6.3b, that that was the right they were talking about, the right with all those limitations? I just want to make sure I'm answering the question correctly on this. So my understanding of your question is that you're, how do we know that that was one of the covered rights based upon the FAR declaration and the policy? So it tracks from, and it's a little bit hard to follow, but essentially it tracks from the Schedule A, where it's all right title and interest of the declarant in the condominium. And when you look at… But what I'm saying is, they say, it's not as, your argument would be much more evident to me if there was simply no right to do any development in consequence of what the statute says. But what they say is that's not the case. There was an expiring right in one instance, and in another instance there was a right to do things subject to unanimous approval. So they say, well, I mean, it just says you had the right. What's the content of the right? So you thought now, or you're now claiming, well, that was this different kind of right, the kind that you can't do. And they say, well, it was the kind of right that you can do. And then that's all that was ensured. And I think maybe I misspoke before when I agreed, when I shouldn't have. I understand your question now, I think. So if the creation of a master unit in which the owner has the perpetual right to construct improvements… Does it say perpetual? Yeah, that does say in 2.3A, B of the FAR declaration, in addition to the next development right down from 6.3B, which is 6.3C. It says that the right is a perpetual one? Yes, utilizing up to 100% of the land area for commercial purposes. Those were not subject to any deadlines. Once it's created, if it's a unit, there's no… And this is part of where the Rhode Island Supreme Court decisions make it a little bit confusing. Okay, so just with respect to the north unit that we're talking about now? Yes, correct. Okay, so just let me understand it. So your argument with respect to the north unit is, if I go by Schedule A of the insurance agreement, it says any right, title, or interest, as reflected in the declarations. And then you're saying there's a provision in the declaration that specifically says you had a perpetual development right? Not a perpetual development right. It's an improvement right once it's created as a unit. Yeah, but I thought that was the whole issue, is that that's the distinction that they say is a distinction that matters between improvement and development. Am I wrong? No, so they clarify in America, too, that an existing unit, if you have an existing unit, then you can construct improvements in it. And the development right in 6.3b allows for the creation of the unit. Right, I guess what I'm saying is, if there is ambiguity in the FAR documents as to whether they clearly covered this, the right you now say you want to do but can't, then it's a little hard for me to see how we could say, I don't know what we're supposed to do exactly with respect to the question of what was insured then. And I don't really see you making an argument or identifying, other than unless your position is just the FAR documents on their face are clear. Suppose I disagree with that. What then happens in the case, I guess, is what I'm really asking. So if the FAR declaration doesn't expressly lay that out, I would defer to the interpretation of the courts that have looked at it, such as the Rhode Island Supreme Court, which states there were five master units and a development right reserve to create a sixth over the reserved area, which is exactly what this right was. Now, I want you to just bear with me real quick, because the units, once you have a created unit, and the development right was exercised by recording amendment, that's all the documents say, once you have a created unit, that's not a defeasible interest. I just want to be really clear on that. It's something that gets confusing. They aren't necessarily subject. You don't have to do anything further with a created unit to perfect your interest. You own it. If you look at the West unit as an example, one of the development rights reserved for the West unit was to convert it to a common element. So once it's created, which is what 6.3b provides, then it's there. You own it. You have to pay condominium fees like the South and the West did all along, and you also, because you own 100% solely of that airspace, you have the right to do what you want inside of it, which is essentially how America II addressed that, where they made the distinction between the development rights. And it makes sense when you look at it that way, even under the Act, if you're the only owner of the cube of airspace, the column of airspace that's an existing unit, then you should have the right to do what you want there. You have the right of possession. You have the right of exclusion. You have all the bundle of rights associated with ownership. Does that clarify? Well, the part that doesn't is that you're conceding that you don't actually have it, correct? Now. Aren't you conceding that now, given the way the law's been interpreted, you don't have that? I'm having trouble hearing you, I'm sorry. I thought you were conceding that as the law stands now, that's not what you have. Because they were not units. Because those types of units are prohibited, we have nothing. We lost everything. We lost the South, the West, and, you know. So is the idea that the word unit in the FAR is what is supportive of your position? Is that what you're trying to get at? I'm just trying to figure out how I figure out what the title insurer insured, and why it's the right you claim that they insured. They insured the right to create that unit over the reserved area, which the result, the master unit that they insured the right to create, prohibited under the Act. That's what the Rhode Island Supreme Court said. If you want to just address the damages issue on the South and West unit. The damages issue with respect to the South and the West, I sort of touched on that very briefly. If you own it and it's a unit, you own 100% of that airspace, you own it alone. So you have the right to improve it, make improvements inside of it. That extends to your basic condo that you think of in Florida, whatever the image of a condo is. If it's a common element, you lose that right. And that's how we lost that right. And therefore, the way you say we should evaluate the market value of it, is it's the market value of what was understood to have been insured, even if that can't be a real thing. Yes. Yes. Otherwise, you say it doesn't make any sense, because you're not really getting what you paid for. Exactly. They're getting credited. The title insurance carrier is getting credited with the defect. The only caveat that I'd add is we also lost the common element ownership interest associated with them being units, which is 20% of the condominium, which, believe it or not, does have value. Judge Lynch, do you have any questions? No. Judge Helpe? Yes, just one question. Counselor, you mentioned, you characterized the Supreme Court, Rhode Island Supreme Court opinion, and American condominiums, the second one, or it could be the first or both, as somewhat confusing. My question is, aren't you, what you're asking this federal court to do, isn't the effect that if we were to rule in your favor, we would be somehow trumping that Rhode Island Supreme Court opinion, which your client did not prevail in that particular case? No. No, not at all. I mean, I'm asking the court to look at those decisions and come to the conclusion that I think everybody who looks at them does, which is, the result of that is properties ended up with nothing. I don't have the luxury in this position to, I could give you my personal opinion as to those decisions, but we fully accept them. They revealed the losses in this case. And this court, I don't believe, I do not believe we're asking this court to buck them in any way, if that was what the question was, or frankly, I would ask you to look to them for guidance. Thank you. Did you suggest that those opinions themselves construe the FAR in a way that you say will be supportive of your view of what had to have been the understanding of the insurance contract? You are saying that though, right? Yeah. Even though the outcome in those cases is negative for you, for these purposes, you say we are bound by their construction of what the document said. 100%. That's helpful. Thank you. The roles have flipped. Yeah. Okay. Thank you. At this time. Thank you, Attorney Benito Tulley, if you could please mute your camera and your audio. And Attorney Snow, if you could unmute your camera and your audio. And introduce yourself on the record to begin. Thank you. Good afternoon. I don't want to tell you what to argue, but I do. We don't have a huge amount of time. It's a complicated case. And I just want to make sure you do address what to me is something that I had trouble following from the briefs, which is what do I look to to figure out what the insurance agreement was? Sure. And I was going to address that as well as the other questions that were raised. My brother's argument. Where my IDC goes wrong. I mean, they correctly quoted schedule A, the policy. Schedule A is not the insuring agreement. They ignore the insuring agreement. The insuring agreement is on the first page of the policy. It's not very long. Let me just read it because I think it's key to answer your question. Subject to the exclusions from coverage, the exceptions from coverage contained in Schedule B, and the conditions and stipulations, Chicago Title Insurance Company, hereinafter called the company, insures, as of the date of policy shown in Schedule A, against loss or damage, not exceeding the amount of insurance stated in Schedule A, sustained or incurred by the insured by reason of, number one, title to the estate or interest described in Schedule A being vested other than as stated therein. Two, any defect in or lien or encumbrance on the title. And three, unmarketability of the title. That's what's insured. So, what we're really talking about is title to the development rights when we're talking about the reserve area. There's no question that was insured. But there were limitations on that. There were limitations in time. According to the master declaration, it had to be exercised by December 31, 1994. But what I guess I'm trying to figure out is if I say I'm going to insure your title in X right, what is the right that you just insured title in? What was the understanding of what that right was when you insured title in it? And that's what I'm not – I'm having trouble figuring out what do I look to to figure that out. I understand that there was a right and that there was title insurance for that right. The other side says the only way to read the agreement given Schedule A and that it refers to the documents is that the right they're talking about for which you got title insurance was the right set forth in the FAR documents. Notwithstanding that that right was not as expansive – couldn't be as expansive as they thought it was. So that's a defect on your part for insuring that right. You say that's not the correct way to read it. And I guess I just want you to walk me through the text of the agreement and the documents so I can understand why you're right. Sure. Well, that's why I talked about the insuring agreement. I don't see what it is. So the development and special declarant rights set forth in the master declaration for the reserved area were expressly subject to complying with the Condominium Act. And, of course, they were time-limited as well. Where is that? That's in the FAR documents themselves? It actually is in four different places. We cite it on our briefs. But in four different places, it says – and I'm paraphrasing – that the declarant has to comply with the Rhode Island Condominium Act. Now, where it can get confusing is there is an exception to that, and that's the ULTA IV endorsement. But it does not apply to the issue of the reserved area because the ULTA IV endorsement, which says notwithstanding what the policy otherwise says, we will insure against defects in the condominium documents for a condominium unit or for the common elements. Now, the reason it doesn't apply to the reserved area is, number one, the reserved area was not a unit. It was simply a right. It was not a condominium unit until the north unit was created. But what about the fact that the FAR refers to it as a unit? Does that matter, or does it not? It does not. It does not. It's simply a development and special declarant right, so it's not a unit. They had a right to create another master unit, which would be the airspace under master common elements. So, from your position, the endorsement doesn't apply to that piece of the thing. And then you just read the text, and it says what you get comes with the statutory restrictions. And so that's all the title you have, and that's therefore all the title to insure. Now, just do the same thing for me with the south and west units. The south and west units were insured. They were units. And they were condominium units, so they were covered by the ULTA IV endorsement. So there's no question the title was insured there. The problem is, and the reason the district court granted summary judgment, is there were no damages. Why? Well, for the south unit, no development rights were preserved. So IDC's argument is, and we heard it again this morning, Before you get that, this is where I just want to make sure I'm following. Because the antecedent question is, what were the development rights that were mistakenly insured? What were those development rights? Do you see what I'm saying? No. Okay, so you say that no development rights were preserved, therefore no damages. But if I'm understanding their argument, you granted title in a unit when technically there was no authority to have that unit. Isn't that right? As for the west and south unit, that's correct. Okay, so what their contention is, once you have the unit, you're liable for the loss on the understanding that they actually got insured what they thought they had. Even though it turns out they don't have it. Because that's what they paid for the insurance for. So you're on the hook for a good unit with all the things that everybody thought a unit was worth. I'm sorry. If the unit had value, you'd be absolutely correct. The problem is, here's why it didn't have value. So the south unit, they did not reserve development and special declarant rights at all. So they're relying upon their improvement rights. But as the Rhode Island Supreme Court made clear, we're not talking about improvement rights. We're talking about constructing buildings. Just so I understand this point, you say even with the mistake you made, you didn't make this mistake. Is that the idea? Yes. We made a mistake by insuring title, which was defective because it never came into existence because they didn't comply with the substantial. But you're saying that mistake didn't carry over and include the additional mistake that they're trying to hold you liable for. Is that the idea? I think what we're arguing is that mistake is without meaning because the units as insured. Well, again, I have to distinguish between the south and the west unit. The south unit had no value because they didn't reserve development rights. And you couldn't use improvement rights in an airspace unit if it existed. And what I'm saying is that the FAR documents at the time the insurance was provided made that much clear even to IDC. I believe so. And actually, if you look at the record, you have to draw an inference from it. So they argue that there's no way that they would have known that the west unit and the south unit were valueless at the time of the policy. That's not correct. And here's why it's not correct. At the time of the policy, which was a $10 million policy, the vast majority of which applied to individual condominium units in the apartment buildings or in townhouses. Only $400,000 did IDC allocate to the reserved area, the west unit and the south unit. Of that, the vast majority of the interest would have been in the reserved area, which comprised 46 percent of the master common elements. That was a seven acre parcel. The other parcels were tiny. But now it's just starting to sound a little bit more to me like a fact question for a jury. I understood your argument. I understand how that's not for a jury. That's just reading documents. It's clear there's no dispute. But why isn't this, once you start getting into, well, I don't know, it depends what they knew, what did they really understand at that time. And at that point, why wouldn't we say, well, that's the kind of thing you would have evidence in a jury to resolve it? Well, I don't think there's any fact question with respect to the south unit. It's simply they didn't reserve. Five minutes remaining. They could have. They didn't. And that's fatal to their case. The west unit, admittedly, is a closer case. But the reason why it was valueless is because even if it had been a unit, they did nothing, absolutely nothing, to try to develop it in terms of filing plans to comply with the 1991 amendments to the Minimac or constructing buildings, which would allow them to have a value in that unit, which their own appraiser says would be valueless if unanimous consent was required, which would be the case for the south unit and would be the case for the west unit after the rights expired. At the time of insurance, at the time of the provision of the title insurance, would have it been clear to IDC that they would have needed unanimous consent? Yes. And they knew that they knew that because because they attempted in before the policy was issued in April of 1994. That's when they passed the Third Amendment and an attempt to extend the development rights. And, you know, we put in evidence that they knew and their lawyers had told them that, you know, you're taking a very aggressive posture here. This could be challenged. It's not at all clear that we have the right to do this. And ultimately, IDC, IDC's president, Tom Bruce, testified that he decided not to rely upon any attempts to extend the development rights, which would be the third, fourth and fifth amendments. And that's why they did the sixth amendment two days before the expiration of the development rights, because he knew that they weren't they weren't valid. So he wasn't going to rely upon. And he didn't. He attempted to exercise that right, which he had the right to do. Maybe I'm misremembering, but I don't recall the district court basing its conclusion on an analysis of the record evidence you're talking about and concluding that that record evidence shows an understanding that no juror reasonably could reject. It never gets into that inquiry at all. I think that's correct. He concluded that both South and the West unit were valueless based upon the undisputed record before. Any other questions for my colleague? Not for me. I will rest on the on our brief for any remaining issues. Thank you. That concludes the arguments for today. This session, the Honorable United States Court of Appeals is now recessed until the next session of the court. God save the United States of America and this honorable court council. You may disconnect from the meeting.